UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Justin L. Byrne,

       Plaintiff,

       v.                           Civil Action No. 1:12-cv-245

Mary Trudell, Jenna Goguen,
Joanne Pereira, Tom Dunn,
Jeffrey Leggio, Andrew Pallito,
Dave Nesbitt,[1]

       Defendants.


## REPORT AND RECOMMENDATION
(Docs. 12, 17)

Plaintiff Justin L. Byrne brings this action *pro se* under 42 U.S.C. § 1983,

claiming that Defendants Jeffrey Leggio, Dave Nesbitt, Jenna Goguen, Mary Trudell,

Tom Dunn, Joanne Pereira, and Andrew Pallito violated his rights under the Fourth,

Eighth, and Fourteenth Amendments to the United States Constitution, and alleging that

these Defendants committed torts of negligence and defamation.  (Doc. 4 at 4.)  Presently

before the Court is Defendants' Motion to Dismiss for failure to state a claim upon which

relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. 12.)  Byrne has filed

both an opposition to the Motion and a Motion to Strike.  (Doc. 17.)

---

[1] Byrne originally filed suit against "Jeff Laegue" and "John Doe" (Doc. 4), but later filed a notice of correction, substituting, respectively, "Jeffrey Leggio" and "Dave Nesbitt" (Doc. 11). Accordingly, all references in the Complaint to "Laegue" and "Doe" are treated as references to Defendants Leggio and Nesbitt.

For the reasons that follow, I recommend that Defendants' Motion to Dismiss be GRANTED in part and DENIED in part, and that Byrne's Motion to Strike be DENIED.

## Factual and Procedural Background

For purposes of deciding Defendants' Motion to Dismiss, the Court accepts as true the facts alleged in the Complaint.

On May 17, 2012, Byrne was released from incarceration at the Northeast Regional Correctional Facility. (Doc. 4 at 4.) Byrne had been imprisoned about five months for a probation violation, and was released, by his own description, contrary to the wishes of both the State and Defendants in this case. (*Id*. at 6.) Upon his release, he was placed on probation and ordered to report to his supervising officer, who provided him with the conditions of his continued supervision. From the date of his release to June 29, 2012, Byrne was ordered to abide by all the conditions and report bi-weekly. (*Id*. at 4.) According to his Complaint, Byrne had been under probation supervision for the previous seven years, during which he had complied with all conditions, including treatment, counseling, and community service. (*Id*.)

At approximately 11:30 p.m. on May 27, 2012, two Field Supervision Unit officers employed by the State of Vermont—Defendants Jeffrey Leggio and Dave Nesbitt—paid Byrne an unexpected visit. (*Id*. at 5.) During the visit, Leggio and Nesbitt searched Byrne's apartment without a warrant. (*Id*.) Byrne, who shares his residence with his grandparents, repeatedly inquired "if this was legal and if the time was reasonable according to the laws and procedures of probation." (*Id*.) The officers responded that they were empowered to "come visit you 365/24/7" if they so desired.

(*Id*.)  Leggio and Nesbitt also told Byrne that they had come earlier, at around 9 p.m., but Byrne had not been home.  (*Id*.)  They also noted that Byrne might have a drinking problem given the number of empty beer cans and bottles in his trash.  (*Id*.)

"[V]ery upset" with what had taken place, Byrne called his probation officer the following morning to ask why the search had occurred and to tell her that he "felt violated."  (*Id*.)  The probation officer's response was "very evasive," and included the allegation that multiple underage girls were seen at Byrne's home, a violation of his condition of release that he not be alone with anyone under the age of eighteen unless approved by his probation officer.  (*Id*.)  No underage children were present in Byrne's home at the time of the search, but, according to Byrne, his grandparents have underage grandchildren who "stop [by] on occasion" to see them.  (*Id*.)

On June 29, 2012, Byrne received a telephone call ordering him to meet with his probation officer as soon as possible.  (*Id*.)  When he did so, Byrne was "inter[ro]gated for a sum of a[n] hour or so" in a "small office" by his probation officers, Defendants Goguen and Trudell.  (*Id*.)  He received a citation for violating his probation conditions, but was permitted to leave the same day.  (*Id*.)  After attending a scheduled family-court proceeding, he was notified by a court officer to return to his probation officer, and, upon doing so, was "verbally assaulted" and "hand cuffed."  (*Id*.)  Byrne has been incarcerated ever since.[2]

---

[2]  In his Complaint, Byrne states that he has been incarcerated "since May 29th 2012" (Doc. 4 at 6), but also acknowledges that he was free until he received the telephone call on "the morni[n]g of June 29th, 2012" (*Id*. at 5) and says at the outset of his Complaint that he was out on conditions of release "[f]rom May 17th, 2012 to June 29th, 2012" (*Id*. at 4).  The lone reference to May 29, 2012 thus appears to have been in error.

Byrne claims that his incarceration has cost him "all existing business that he had and clients that were recently a[c]quired" as well as "many r[e]lationships." (*Id.* at 6.) He further claims that, during his incarceration, he was punished on multiple occasions "due to false information sent in emails from [his] probation officer." (*Id.*)

Byrne raises a number of additional allegations against each Defendant beyond this single incident.

First, under the heading "[d]eliberately indifferent with [m]alice," Byrne makes the following allegations. During Byrne's period of release, from January to June 2012, Defendant Trudell, Byrne's probation officer, made numerous "threats of revocation" of probation and "denied girlfriend contact without just reasons." (*Id.*) Defendant Goguen, who was "trained and groomed" by Trudell after being "recently appointed" to Byrne's case, took part in the same activity, as well as "restricting contact with friends for no reasons" and "sending defaming accusations" to employees of the prison facility housing Byrne. (*Id.*) According to Byrne's allegations, Goguen had also been "extremely late" to their meetings, making it difficult for Byrne to re-establish his business, and made various threats against Byrne. (*Id.*) Although Byrne has never met Defendant Pereira, she took part in a meeting involving Byrne's desire to have contact with his child. Byrne claims that at this meeting his confidentiality was breached, and threats were made against the child's mother that the child would be taken away if she did not cooperate in making incriminating statements against Byrne. (*Id.*) Pereira has also been working to make Byrne's incarceration "much harder th[a]n needed" ever since Byrne told Goguen that Pereira should "kiss his ass." (*Id.*) Byrne claims that Defendant Dunn also took part

in the meeting involving his desire to have contact with his child, and Dunn made "defaming" statements and "unprofessional assessments" about him.[3] (*Id.*) As for Defendant Pallito, Byrne describes him as the "man in charge" and thus responsible for the actions and training of the other Defendants. (*Id.* at 7.) Byrne alleges that, even after he sent Pallito a "very detailed letter," Pallito did not change the actions of his subordinates. (*Id.*)

Second, Byrne raises a number of additional allegations under the heading "Due Process Clause." (*Id.* at 7.) According to Byrne, Defendant Trudell failed to follow procedures for client transfer and made an "ambig[u]ous" contract with conditions unapproved by the court. (*Id.*) Byrne alleges that Defendant Goguen failed to have a "team treatment meeting" to approve special sex offender conditions, did not give Byrne notice or the reasons for restricting his contact with his child, "broke the chain of command" by having certain telephone numbers blocked so Byrne could not call them without prior approval from her superiors, used unlawful means to obtain a motion from state court, ignored Byrne's grievances, gave false information to prison officials (leading to an official sanction), and breached confidentiality by providing private information about Byrne without his consent. (*Id.*) Byrne further alleges that Defendants Leggio and Nesbitt conducted the warrantless search, and failed to visit Byrne at a reasonable time as required by the rules governing supervision. (*Id.*) According to Byrne, Defendants

---

[3] Byrne also claims that he first met Dunn in a "social setting," which means that Dunn has a conflict of interest when it comes to Byrne's supervision. (Doc. 4 at 6.)

Dunn, Pereira, and Pallito all "sign[ed] off" and "approve[d]" the conduct of the officers "without interference." (*Id.*)

Finally, under the heading "[n]egligence, injury to feeling and reputation," Byrne refers to certain tort causes of action and the consequences of Defendants' actions. (*Id.*) He claims to be depressed, medicated due to his anxiety and restlessness, and suffering severe weight fluctuations causing kidney and liver problems. (*Id.*) Byrne also claims to have suffered reputation loss after being "defamed" in the "community media." (*Id.*) He further claims that his "rights and privileges of being on probation" have been violated and, now, revoked. (*Id.*)

After being granted leave to file *in forma pauperis* (Doc. 2), Byrne filed the Complaint in this case on October 31, 2012 (Doc 4). The Complaint names as Defendants multiple individuals at different levels of the Vermont Department of Corrections (DOC) in varying capacities, including: Defendants Leggio and Nesbitt, the field supervision unit officers, in their individual capacities; Defendants Goguen and Trudell, the probation officers, in their individual capacities; Defendant Dunn, the supervisor of the Morrisville probation and parole for the DOC, in his individual capacity; Defendant Pereira, district manager for the DOC, in her official and individual capacity; and Defendant Pallito, Commissioner of the DOC, in his official and individual capacity. (Doc. 4 at 4.) Based on the facts stated above, Byrne alleges violations of the Fourth, Eighth, and Fourteenth Amendment (specifically, the due process clause), as well as the torts of negligence and defamation. (*Id.*) He brings his Eighth and Fourteenth Amendment claims against each Defendant, and his Fourth Amendment claims against

only Defendants Leggio and Nesbitt.  (*Id*. at 8)  He brings his tort claims against Defendants Goguen, Trudell, Pereira, Dunn, and Pallito.  (*Id*.)

Byrne requests multiple forms of relief.  First, he seeks a declaratory judgment stating that the acts of Defendants violated his Fourth, Eighth, and Fourteenth Amendment rights.  (*Id*.)  Next, he asks for injunctive relief ordering Defendant Pallito to: conduct a full investigation, remove the detainer holding Byrne in jail, provide for Byrne's supervision by a probation officer unaware of his claim "so that he gets a fair chance at rehabilitation," and "[i]mmediately" arrange for Byrne's release.  (*Id*.)  Byrne seeks compensatory damages in the amount of $109,000 jointly and severally from all Defendants "for the days of freedom lost"; and punitive damages of $2,000 each from Defendants Leggio and Nesbitt; $3,000 each from Defendants Pallito, Pereira, and Dunn; and $10,000 each from Defendants Trudell and Goguen.  (*Id*. at 8-9.)  Finally, Byrne requests "such other relief as it may appear that [he] is entitled" to, including: a public apology in the local newspapers and USA Today, expungement of his record, a "certificate" proving that all Defendants were "punished" for their misbehavior, and a requirement that each Defendant complete 100 hours of community service at a non-profit group of Byrne's choosing.  (*Id*. at 9.)

Defendants filed a Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. 12.)  In response, Byrne filed a "Motion to Strike Pursuant to Rule 12(f)(2) . . . in Opposition to the Defendants['] Motion to Dismiss." (Doc. 17.)

## Discussion

Title 42 U.S.C. § 1983 provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To succeed on a § 1983 claim, a plaintiff must allege that: "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)); *see also Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Defendants have moved to dismiss Byrne's § 1983 and state law tort claims for multiple reasons. First, Defendants Pereira and Pallito argue that the claims against them in their official capacities should be dismissed because maintenance of such suits would abridge Vermont's Eleventh Amendment sovereign immunity. Second, all Defendants argue that certain of the § 1983 claims should be dismissed for Byrne's failure to show their personal involvement in the alleged constitutional deprivation. Third, Defendants Leggio and Nesbitt argue that the Fourth Amendment claims should be dismissed by

application of qualified immunity.  Fourth, all Defendants argue that the Eighth and

Fourteenth Amendment claims should be dismissed for failure to allege violations of

federal rights.  Fifth, all Defendants argue that the § 1983 claims should be dismissed by

application of the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994) because

Byrne's success would necessarily invalidate his continued incarceration.  Sixth,

Defendants argue that both compensatory and punitive damages are unavailable.

Seventh, and finally, Defendants argue that the state tort claims should be dismissed by

application of the Vermont Tort Claims Act, 12 V.S.A. §§ 5601-5606.

## I.      Legal Standard for a Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint

must "provide the grounds upon which [its] claim rests."  *ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  A plaintiff must also allege "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and

plain statement of the claim showing that the pleader is entitled to relief").  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009).  As described by the Supreme Court in *Iqbal* and

*Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to

support his claims, but the "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  The plaintiff must allege

sufficient facts to show "more than a sheer possibility that a defendant has acted

unlawfully." *Iqbal*, 556 U.S. at 678.  If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In assessing the adequacy of the pleadings, a court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff.  *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011); *ATSI Commc'ns*, 493 F.3d at 98.  A complaint is properly dismissed, where, as a matter of law, "the allegations in [it], however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  Conversely, this presumption of truth "is inapplicable to legal conclusions," and therefore the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678; *see also Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions" (citation omitted)).

The question on a Rule 12(b)(6) motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims'" raised in the complaint.  *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the claims.  *Halebian v. Berv*, 644 F.3d 122,

130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). In essence, the question is whether some plausible narrative supports plaintiff's claim such that the case merits discovery; the Federal Rules of Civil Procedure "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In cases involving a *pro se* plaintiff, as here, the court must construe the complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), by "reading such submissions 'to raise the strongest arguments they suggest.'" *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). In assessing *pro se* complaints challenged by Rule 12(b)(6) motions to dismiss, courts "apply[] a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 139-40 (2d Cir. 2000). "This is particularly so when the *pro se* plaintiff alleges that h[is] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Nonetheless, even *pro se* litigants "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and

*Iqbal*." *Brickhouse v. City of New York*, No. 09 CIV. 9353, 2010 WL 3341845, at *2

(S.D.N.Y. Aug. 16, 2010); s*ee Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-

5416-CV, 2008 WL 4951045, at *1 (2d Cir. Nov. 20, 2008); *see also Triestman*, 470 F.3d

at 477 ("*pro se* status does not exempt a party from compliance with relevant rules of

procedural and substantive law").

## II.     Timing of the Filing of the Motion to Dismiss

As a preliminary matter, I must first assess whether the Motion to Dismiss was

filed prematurely.  Byrne has moved to "strike" the Motion to Dismiss because it was

filed before "all parties involved ha[d] acknowledged []or waived the service of

summons."  (Doc. 17 at 1.)  By December 28, 2012, when all Defendants moved to

dismiss, only Defendants Pallito and Pereira had executed and returned the waiver of

service.  (Docs. 5, 6, 8, 9.)  Thereafter, the remaining five Defendants promptly waived

service.  (Docs. 13, 14, 15, 18, 19.)

The purpose of requiring service of process upon defendants is to ensure that the

parties against whom a case is brought are fully aware of the pending case against them.

*See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999); *see*

*also Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa*, 428 F.

Supp. 1237, 1251 (S.D.N.Y. 1977) (primary purpose of rules governing service of

process is "to give the defendant adequate notice that an action is pending"); *Nat'l Equip.*

*Rental, Ltd. v. Szukhent*, 311 F.2d 79, 83 (2d Cir. 1962) ("The purpose of service of

process is to apprise the defendant that suit has been brought against him and to give him

an opportunity to defend.").  Only upon service of a summons, or waiver of service, is a

party required to appear and defend in an action.  *See Murphy Bros.*, 526 U.S. at 350.  In this way, service protects the interests of defendants, not plaintiffs.

Here, the fact that Defendants filed this Motion to Dismiss clearly indicates that they received adequate notice of the Complaint and its contents.[4]  If Defendants considered service of process deficient, they could have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process or raised the objection as an affirmative defense in their first responsive pleading.  By instead filing a motion to dismiss for failure to state a claim, Defendants waived any defense or objection relating to the inadequacy of service of process.  *See* Fed. R. Civ. P. 12(h)(1); *United States v. Tomasello*, 569 F. Supp. 1, 2 (W.D.N.Y. 1983) (failure to include defense of insufficiency of service of process in first motion to dismiss constitutes waiver).  Byrne cites no relevant law for the notion that a motion to dismiss filed before service on every defendant is premature.  Finding none myself, I conclude that his argument, inconsistent as it is with the purpose of service, is unfounded.[5]

Accordingly, the Court should DENY Byrne's Motion to Strike.  (Doc. 17.)

---

[4]  I note that every waiver in this case was signed by a representative of the Vermont Attorney General's office rather than Defendants themselves, making all waivers but the first one (though technically necessary) effectively redundant.  (Docs. 5, 6, 8, 9, 13, 14, 15, 18, 19.)

[5]  The delay in obtaining waivers from certain Defendants is traceable to Byrne's own conduct. Originally, Byrne filed suit against "Jeff Laegue" and "John Doe" instead of "Jeffrey Leggio" and "Dave Nesbitt," respectively.  *See supra* n.1.  Service was not even possible until Byrne filed these name corrections two months after filing his Complaint.  (Doc. 11.)  The Motion to Dismiss was filed two days later.  (Doc. 12.)

## III.    Sovereign Immunity

Defendants Pallito and Pereira first move to dismiss all § 1983 claims against them in their official capacities, arguing that these claims are barred by Vermont's sovereign immunity under the Eleventh Amendment.[6]

"Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989).  Pursuant to the doctrine of sovereign immunity, federal jurisdiction over suits against unconsenting states or state officials "was not contemplated by the [C]onstitution when establishing the judicial power of the United States." *Hans v. Louisiana*, 134 U.S. 1, 15 (1890).  Thus, the Eleventh Amendment bars suits in federal court by private citizens against a state, its agencies, or its officials unless the state has waived its immunity or Congress has properly abrogated that immunity.[7] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984).  Any waiver of Eleventh Amendment immunity by a state must be unequivocally expressed. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985).

---

[6]  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has also been interpreted to bar federal suits against state governments by a state's own citizens.  *See Hans*, 134 U.S. at 15.

[7]  Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976), but it has not done so in any way relevant to this case.  It is well settled that Congress did not intend to abrogate sovereign immunity by the enactment of § 1983.  *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979).

"The [E]leventh [A]mendment also bars suits against state officials and state agencies if the state is the *real* party in interest, regardless of whether the state is named as a party to the action." *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). Because an action against federal officers in their official capacities is essentially a suit against the United States, such suits are barred under the doctrine of sovereign immunity.[8] *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (citing *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Unlike a personal capacity suit, in which an award of damages would be executed only against the official's personal assets, an official-capacity suit results in a damages judgment against the state itself. *See id.* Vermont has not waived its sovereign immunity under § 1983. *See* 12 V.S.A. § 5601(g) (Vermont Tort Claims Act reserves Eleventh Amendment immunity for all claims not specifically waived). As a result, Vermont state officials cannot be subject to suit in their official capacities for retrospective relief, such as money damages, under § 1983.[9]

---

[8] These "official capacity" claims for damages should also be dismissed because "[n]either a state nor one of its agencies nor an official of that agency sued in his or her official capacity is a 'person' under § 1983." *Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)).

[9] Byrne may, however, seek injunctive and declaratory relief against Defendants Pereira and Pallito in their official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10 (quoting *Graham*, 473 U.S. at 167 n.14). Thus, to the extent that Byrne seeks such relief, those claims are not barred by sovereign immunity.

As relevant here, the Vermont DOC is an agency of the State of Vermont, Defendant Pallito is DOC Commissioner, and Defendant Pereira is a District Manager for one of DOC's field offices.  Thus, to the extent Byrne brings his § 1983 claims against Defendants Pallito and Pereira for money damages in their official capacities, those claims should be DISMISSED.

## IV.  Personal Involvement

Next, Defendants argue that certain claims against them should be dismissed for lack of personal involvement.

To recover damages under 42 U.S.C. § 1983, a plaintiff must establish the personal involvement of each of the individual defendants.  It is well established in the Second Circuit that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991).  In this way, a prison official cannot be held personally liable under § 1983 on the basis of *respondeat superior* or simply because he or she sits atop the prison hierarchy.  *See Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).  Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Direct participation, however, is not strictly necessary.  Personal involvement can be shown by

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the

defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.[10]

## A.    Defendant Pallito

Byrne's Complaint makes no allegations indicating that Pallito had any direct involvement in the claimed constitutional violations.  Rather, according to Byrne, Pallito is liable because he is the "Commis[s]ioner" and thus the "man in charge" for the actions and training of those who were directly involved.  (Doc. 4 at 7.)  In other words, Byrne hinges his claim of liability on Pallito's supervisory position in the prison system, a classic claim of *respondeat superior* that it not cognizable under § 1983.  The bare fact that Pallito occupies a position of high authority in the Vermont prison hierarchy is insufficient to sustain Byrne's claim.  Furthermore, the allegations in the Complaint fall far short of demonstrating a policy or custom of constitutional violations, and do not rise to the level of grossly negligent supervision.  *See Colon*, 58 F.3d at 873-74.

---

[10]  There is disagreement within the Second Circuit as to whether the Supreme Court's decision in *Iqbal* abrogated any of the *Colon* categories of supervisor liability.  *See Morrissette v. Cripps*, No. 10 Civ. 8795, 2011 WL 4089960, at *2 (S.D.N.Y. Sept. 14, 2011) (recognizing disagreement); *Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dept. of Homeland Sec.*, 811 F. Supp. 2d 803, 814 (S.D.N.Y. 2011) ("The Court of Appeals has not yet definitively decided which of the *Colon* factors remains a basis for establishing supervisory liability in the wake of *Iqbal*, and no clear consensus has emerged among the district courts within the circuit."); *Inesti v. Hogan*, No. 11 Civ. 2596, 2013 WL 791540, at *11-12 (S.D.N.Y. March 5, 2013) (Peck, Mag. J.) (noting that *Iqbal* involved a claim of intentional discrimination, and that "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon* may still apply"); *see generally* Desiree L. Grace, Comment, Supervisory Liability Post-*Iqbal*: A "Misnomer" Indeed, 42 Seton Hall L. Rev. 317 (2012).  Given the absence of any Second Circuit decision specifically overturning *Colon*, I continue to treat it as good law for the purposes of deciding Defendants' motion to dismiss.

But Byrne also alleges that he sent Pallito a "detailed letter seeking relief from the abuse" alleged in his case, and "the response was that he upheld their ruling." (*Id.*) "Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim." *Candelaria v. Higley*, No. 04-CV-277, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (collecting cases). Further, if a defendant refers or forwards such a letter to another staff member, personal involvement still cannot be shown. *See Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (affirming dismissal of case where personal involvement "was limited to the receipt of two letters from [plaintiff], which [defendant] promptly referred to other individuals for investigation and response"); *Garvin v. Goord*, 212 F. Supp. 2d 123, 126 (W.D.N.Y. 2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action"); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997). "If, however, the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citations omitted).

The precise contents of the alleged letter are unspecified, and it is unclear whether Pallito responded directly to it, referred the matter down the chain of command to a subordinate, or ignored it entirely. Byrne expressly claimed in his Complaint that "he" affirmatively upheld the decision of those involved, perhaps a cryptic reference to Pallito's personal, direct response to the letter. In any event, giving Byrne the benefit of

the doubt as to this ambiguity, I conclude that Byrne has sufficiently alleged Pallito's personal involvement in the claimed constitutional violations.[11] *See Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986). In the language of *Colon*, Pallito was a supervisory official who, "after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon*, 58 F.3d at 873.

Thus, Byrne's § 1983 claims against him should not be dismissed on this basis. Without more facts concerning Byrne's letter and Pallito's response, I cannot conclude that Byrne can prove no set of facts to support his claim that Pallito knew of the deprivation and failed to remedy the situation. *See Johnson v. Bendheim*, No. 00 Civ. 720, 2001 WL 799569, at *6 (S.D.N.Y. July 13, 2001) (motion to dismiss denied as to prison official who received prisoners' grievances and denied them).

Accordingly, I recommend that Defendant Pallito's motion to dismiss for lack of personal involvement be DENIED.

### B. Defendants Pereira and Dunn

Defendants Pereira and Dunn were not personally involved in the circumstances of Byrne's Fourteenth Amendment claim. By Byrne's description, their liability hinges on the fact that they "sign[ed] off and approve[d] the conduct of their officers without interference." (Doc. 4 at 7.) Such a *respondeat superior* theory of liability is inapplicable to § 1983 claims. Accordingly, the § 1983 claims against Defendants

---

[11] In their Motion to Dismiss, Defendants entirely overlooked the allegation concerning the letter.

Pereira (in both her individual and official capacities) and Dunn premised upon violations of the Fourteenth Amendment should be DISMISSED.[12]

### C. Defendants Leggio and Nesbitt

Defendants Leggio and Nesbitt—the officers who conducted the warrantless search of Byrne's home—had no personal involvement in any conduct described in the Complaint other than the search.  This search, which forms the basis of Byrne's Fourth Amendment claim, does not relate to any of Byrne's other claims.  (Doc. 4 at 6-7.)  Thus, Byrne's § 1983 claim against Leggio and Nesbitt for violations of the Eighth and Fourteenth Amendment should be DISMISSED for lack of personal involvement.

To summarize, the Fourteenth Amendment claims against Defendants Pereira and Dunn, as well as the Eighth and Fourteenth Amendment claims against Leggio and Nesbitt, should be DISMISSED for lack of personal involvement.

## V. Qualified Immunity

Next, Defendants Leggio and Nesbitt argue that the remaining Fourth Amendment claim against them should be dismissed by application of principles of qualified immunity.

Qualified immunity shields government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[12] Defendants also argue in their Motion to Dismiss that the Fourth Amendment claims against Pereira, Dunn, Goguen, and Trudell should be dismissed on this basis.  (Doc. 12 at 7.)  But Byrne brings this claim against only Defendants Leggio and Nesbitt, the officers who conducted the search, and not against the other Defendants.  (Doc. 4 at 8.)  Thus, there are no Fourth Amendment claims against these Defendants to dismiss.

known." *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). The purpose of this doctrine is to strike an appropriate balance between two competing government interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, qualified immunity protects government officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)) (internal quotation marks omitted).[13]

The stage of the litigation bears on the qualified immunity question. Here, rather than asserting an affirmative defense in an answer, *see* Fed. R. Civ. P. 12(b), Defendants have elected to press their qualified immunity defense in a Rule 12(b)(6) motion to dismiss. Accordingly, they "must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). The Second Circuit has stated that reliance upon qualified immunity at the motion to dismiss stage, before any discovery has taken place, creates a "formidable hurdle" for defendants in the

---

[13] Qualified immunity is available for officials who, like Leggio and Nesbitt, have been sued in their individual capacities; it is not available as a defense for officials sued in their official capacities. *See Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) ("Immunity, either absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities; '[t]he immunities [officials] enjoy when sued personally do not extend to instances where they are sued in their official capacities.'" (quoting *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999))).

application of the doctrine, *McKenna*, 386 F.3d at 434, such that "[u]sually, the defense

of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion," *Green v.

Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983).  This is because, for one, the court must

assess the plaintiff's claims (like the entirety of the motion to dismiss) on the basis of the

facts alleged in the complaint, which the court must treat as true for purposes of a claim

of immunity.  *See McKenna*, 386 F.3d at 434.  Byrne is "entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that

defeat the immunity defense."  *Id*. at 436.[14]  Secondly, claims concerning a government

official's qualified immunity typically "depend[] upon the circumstances and motivations

of his actions, as established by the evidence *at trial*."  *Id*. (emphasis added).  Thus, "the

affirmative defense of qualified immunity generally cannot support a grant of a Rule

12(b)(6) motion to dismiss because the defense requires an investigation into the facts

and evidence not available at this early stage of the pleadings."  *Huminski v. Rutland

County*, 148 F. Supp. 2d 373, 375 n. 1 (D. Vt. 2001).

 But this road is not impassable.  Indeed, the Supreme Court has "stressed the

importance of resolving immunity questions at the earliest possible stage in litigation,"

*Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam), including resolution "prior to

discovery," *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987).  Because qualified

immunity is "an immunity from suit rather than a mere defense to liability[,] . . . it is

effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472

---

[14]  This is unlike a properly-supported summary judgment motion, which cannot be opposed by mere reliance upon the allegations in the Complaint.  *See* Fed. R. Civ. P. 56(c).  Thus, the burden on a defendant seeking to invoke the protection of qualified immunity at the motion to dismiss stage is higher than a litigant proceeding by summary judgment motion.  *See McKenna*, 386 F.3d at 436.

U.S. 511, 526 (1985) (emphasis omitted).  Early resolution of such claims thus serves the purpose of qualified immunity.  Where "the complaint itself establishes the circumstances required as a predicate to a finding of qualified immunity," there is no need to require an answer, discovery, hearing, or trial.  *Green*, 722 F.2d at 1019.  To meet the exacting standard necessary to assert a successful qualified immunity defense in a Rule 12(b)(6) motion to dismiss, "[n]ot only must the facts supporting the defense appear on the face of the complaint . . . but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *McKenna*, 386 F.3d at 436 (quotation omitted).

As to the legal standard pertinent to claims of qualified immunity, a two-step inquiry generally applies.  A state official is qualifiedly immune from suit if: "(1) his conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for the officer to believe his conduct did not violate clearly established constitutional rights."  *Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 410 (S.D.N.Y. 2004) (citing *Lennon v. Miller*, 66 F.3d 416, 418 (2d Cir. 1995)).

At the first step, the Court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the defendants have not violated the plaintiff's constitutional rights, then the issue of qualified immunity need not be further addressed, since "where there is no viable constitutional claim, defendants have no need of an immunity shield."  *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (citations omitted).  Assuming a constitutional violation, the next question is whether the

right was clearly established "in light of the specific context of the case." *Id.* (quotation omitted)  When determining whether a constitutional right was clearly established, the right must have been "sufficiently clear" that a reasonable official would have understood that what he did was a violation of that right.  *See Creighton*, 483 U.S. at 640; *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002).  A right is clearly established when it is supported by the decisional law of the Supreme Court or the applicable circuit court.  *Abromaitis*, 294 F.3d at 361.[15]

Assuming the violation of a clearly established federal right, a state official will only be liable if he acted "unreasonably."  Qualified immunity protects the government officer "if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act."  *Lennon*, 66 F.3d at 420 (citing *Creighton*, 483 U.S. at 641); *see also Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000).  Objective reasonableness is established where "officers of reasonable competence could disagree" as to the legality of the defendant's actions.  *Malley v. Briggs*, 475 U.S. 335 (1986).  This "reasonableness" inquiry is part and parcel of the threshold "rights" question, as a court can only ascertain the objective reasonableness of an officer's actions "in light of the legal rules that were 'clearly established' at the time [the action] was taken."  *Creighton*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S.at 818).

---

[15]  In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that district courts are not obligated to follow this strict two-step process, and instead may proceed directly to the second step to assess whether a right was "clearly established."  In other words, courts need not necessarily decide whether a constitutional violation occurred (particularly where that inquiry would be especially complex) where the right at issue was not "clearly established."

Byrne's § 1983 claim against Defendants Leggio and Nesbitt is grounded in the belief that their warrantless search of Byrne's home at approximately 11:30 p.m. on May 27, 2012 violated Byrne's Fourth Amendment right to protection against unreasonable searches.  If clearly established law demonstrates that the search did not violate Byrne's Fourth Amendment rights, Defendants are entitled to qualified immunity.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The bulwark of Fourth Amendment protection is the Warrant Clause, which requires that police obtain a warrant from a neutral magistrate, supported by probable cause, before engaging in a search.  Absent an exception to the warrant requirement, a warrantless search is *per se* unreasonable and violates the Fourth Amendment.  *See Katz v. United States*, 389 U.S. 347, 357 (1967).

Relevant to this case, the Supreme Court has established an exception to the warrant requirement for a state's operation of a probation system, as such a supervisory program "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987).  The Court based this view on its conclusion that probationers do not have the same level of protection against unreasonable searches as the average citizen, but instead enjoy only a conditional liberty dependent on their adherence to special probation restrictions. *Id.* at 874.  Probationers, like Byrne, remain

subject to a form of criminal sanction "on a continuum of possible punishments." *Id*.

Therefore, they can be subjected to burdens upon their privacy that would be

unconstitutional were they applied to the general citizenry, as long as those burdens are

imposed pursuant to a regulation that satisfies the Fourth Amendment's reasonableness

requirement. *See id*. at 873. In addition, "a probable-cause requirement would reduce the

deterrent effect of the supervisory arrangement" and thus "unduly disrupt[]" the

probation regime. *Id*. at 878. "Supervision, then, is a 'special need' of the State

permitting a degree of impingement upon privacy that would not be constitutional if

applied to the public at large." *Id*. at 875.[16]

    This analysis hinges on the existence and proper application of a governing

statute, regulation, or condition of supervision authorizing the warrantless search.

Indeed, in *Griffin*, the Supreme Court explicitly stated that it was "unnecessary to

consider whether . . . *any* search of a probationer's home by a probation officer is lawful

when there are 'reasonable grounds' to believe contraband is present." *Id*. at 880.

Instead of establishing such a broad exception to the warrant requirement, the Court

focused its analysis on the reasonableness of the specific state regulation under which the

officers in that case had conducted the search. The Wisconsin regulation in *Griffin*

permitted a search on "reasonable grounds," which, as challenged in that case, included a

---

[16] The Supreme Court and this circuit have extended this analysis to parolees as well as probationers. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972); *United States v. Thomas*, 729 F.2d 120, 123 (2d Cir. 1984); *accord United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) (per curiam) (holding that parole justifies at least the same measure of departures from traditional Fourth Amendment requirements as probation, and probably more, since parolees enjoy even less of the average citizen's freedom than probationers). Given Byrne's description of himself in his Complaint as a probationer (Doc. 4 at 4), this line of cases is inapplicable except insofar as it sheds light on the underlying Fourth Amendment doctrine. *See, e.g., Samson v. California*, 547 U.S. 843 (2006).

tip from a police detective that the probationer "may have had" an illegal weapon in his

home. *Id*. at 875. Upon finding that the regulation "itself satisfie[d] the Fourth

Amendment's reasonableness requirement," *id*. at 873, the Court went no further. In a

later decision applying *Griffin*, the Second Circuit explained that, although probationers

must tolerate greater privacy intrusions than the general population, such searches must

"occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's

reasonableness requirement.'" *United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004)

(quoting *Griffin*, 483 U.S. at 875).

The Supreme Court elaborated on this requirement in *United States v. Knights*,

534 U.S. 112 (2001). There, the Court permitted a search of a probationer executed

pursuant to a condition of probation (rather than a state statute or regulation) requiring the

individual to submit his "person, property, place of residence, vehicle, personal effects, to

search at any[]time, with or without a search warrant, warrant of arrest or reasonable

cause by any probation officer or law enforcement officer." *Id*. at 114. The Court

recognized its dual (and sometimes dueling) interests in integrating probationers back

into the community and in combating recidivism, and thus reiterated the probationer's

reduced expectation of privacy. But the Court declined to hold that the inclusion of this

provision in the probation terms triggered a complete waiver of the probationer's Fourth

Amendment rights because the search, as executed, "was reasonable under our general

Fourth Amendment approach." *Id*. at 118. Under this approach, for a search of a

probationer's home, the Fourth Amendment requires no more than a reasonable suspicion

of criminal conduct, rather than probable cause. *Id*. at 121 ("When an officer has

reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."). As the search at issue was both "supported by reasonable suspicion *and* authorized by a condition of probation," it met the requirements of the Fourth Amendment.  *Id*. at 122.

The *Knights* Court thus did not address whether the search would have been permitted if it was predicated *solely* upon the probation condition, but unsupported by any degree of suspicion.

The Court reached this question in *Samson v. California*, 547 U.S. 843 (2006), albeit in the context of a search of a parolee (rather than a probationer).  The *Samson* Court—assessing a state law that authorized warrantless and suspicionless searches— concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee."  *Id*. at 857.  In reaching its decision, the Court first noted that "parolees have fewer expectations of privacy than [even] probationers, because parole is more akin to imprisonment than probation."  *Id*. at 850. This reduced expectation of privacy was further lessened by the fact that the condition permitting warrantless and suspicionless searches was clearly communicated to the parolee when he "signed an order submitting to the condition and thus was unambiguously aware of it."  *Id*. at 852 (quotation omitted).  Knowing submission to the search condition "significantly diminished [the parolees'] reasonable expectation of privacy," as the parolee was made aware that he could be searched at any time.  *Id*. (quotation omitted).  Given the number of parolees in the State of California, as well as

the State's high recidivism rate, "[t]he California Legislature ha[d] concluded that . . . a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders." *Id*. at 854. By the Court's description, this legislative decision made "eminent sense." *Id*. As a result, the Court concluded that the Fourth Amendment does not prohibit an officer from conducting a suspicionless search of a parolee. *Id*. at 857.

Again, this authority to search was not freestanding—the Court tethered its conclusion as to the constitutionality of the suspicionless search to the existence of a valid state law permitting it.

In the same vein, the Second Circuit has upheld certain warrantless searches of a probationer or parolee, but in all such cases the searches were supported by either a state law or a condition of probation. *See United States v. Chirino*, 483 F.3d 141 (2d Cir. 2007) (upholding warrantless search of probationer's bedroom where conditions of probation required him to permit officers to search his residence); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) (upholding reasonableness of search of parolee's residence where New York state parole regulations permitted warrantless searches and where parolee consented to these conditions); *United States v. Thomas*, 729 F.2d 120, 123 (2d Cir. 1984) (upholding warrantless search of parolee's clothing during visit to parole office, where parolee was alerted to conditions of parole, which "included consent to searches and inspections of his person and property by his parole officer"). Without state-law authorization, the Fourth Amendment's warrant requirement presumptively applies to the search of a probationer's home. *See United States v. Rea*, 678 F.2d 382,

387 (2d Cir. 1982) (squarely rejecting proposition that an individual's status as probationer alone justifies an exception to the warrant requirement where no statutory provision authorizes a warrantless search).

In sum, a search of a probationer must conform to a relevant state rule, and that rule itself must pass constitutional muster.

Thus, "[p]arolee searches are . . . an example of the rare instance in which the contours of a federal constitutional right are determined, in part, by the content of state law." *United States v. Freeman*, 479 F.3d 743, 747-48 (10th Cir. 2007).  Vermont law includes a strict requirement that conditions of probation be narrowly tailored to the probationer's circumstances.  *See State v. Moses*, 159 Vt. 294, 304, 618 A.2d 478, 484 (1992) ("[T]he key factor is whether the conditions are . . . narrowly tailored to fit the circumstances of the individual probationer.").  The Vermont Supreme Court has held that "[e]ven when a probationer signs a blanket condition agreeing to future searches, he may continue to enjoy residual privacy rights deserving some constitutional protection."[17] *State v. Lockwood*, 160 Vt. 547, 556, 632 A.2d 655, 661 (1993).  Probation conditions permitting searches should, "[i]deally . . . limit the search to the specific requirements for the supervision of the particular defendant."  *Id*. at 557, 632 A.2d at 661.  Broad

---

[17]  In Vermont, warrantless searches must be supported by a condition of probation, as "Vermont has no statutory scheme regulating warrantless probation searches."  *Moses*, 159 Vt. at 304, 618 A.2d at 484.  The statute authorizing probation allows the imposition of a condition that requires the offender to "[p]ermit the probation officer to visit the offender at reasonable times at his or her home or elsewhere," 28 V.S.A. § 252(b)(10), and permits the court to set conditions "reasonably related to [the offender's] rehabilitation," 28 V.S.A. § 252(b)(18).  Vermont's statutory scheme thus appears to authorize a condition of Byrne's probation permitting warrantless searches, so long as that condition is "reasonably related" to Byrne's rehabilitation, as found by the sentencing judge.  But the statute does not itself permit the search; it merely allows for the establishment of the condition that, in turn, authorizes the search.  In their motion, Defendants have not purported to cite any state statute authorizing the search that occurred in this case.

probation conditions, permitting search at any time for any reason, should be reserved for probationers with a "high risk of recidivism" who merit "rigorous scrutiny" during their probation term. *Id.* The court has sanctioned such broad conditions only for cases where "the evidence of the high risk that defendant would repeat his offense supported the condition allowing a search by the probation officer." *Id.* at 558, 632 A.2d at 662. A probation condition allowing warrantless searches must also be based upon specific factual findings "that set a proper balance between probationer's privacy rights and the state's special needs." *Moses*, 159 Vt. at 305, 618 A.2d at 484.

In *Lockwood*, the court noted that the probation condition at issue in that case, as written—permitting searches at any time, unbounded by a suspicion requirement—would be impermissible. *Lockwood*, 160 Vt. at 558, 632 A.2d at 662. However, the court concluded that the search could be given a *post hoc* justification, even if based on an overbroad probation condition, so long as the "decision to search was in fact narrowly and properly made on the basis of reasonable suspicion." *Id.* (citation omitted). In other words, the circumstances of the search itself can cabin an otherwise-unqualified probation condition and save it from constitutional invalidation.[18]

---

[18] In a recent case, the Vermont Supreme Court rejected a federal and state constitutional law challenge to a warrantless and suspicionless search of a convicted offender furloughed to his home pursuant to a standard condition of a conditional reentry agreement allowing for such searches. *See State v. Bogert*, 2013 VT 13, 2013 WL 646221. The Court permitted the search condition because, in contrast to a probationer, an individual released on furlough has no protected right to their furlough status and can thus be reincarcerated at any time with no right to due process. Distinguishing *Lockwood*, the Court reasoned that "[t]he scope of an offender's reasonable expectation of privacy in the home, when he or she can be returned to a correctional facility at the discretion of the Commissioner of Corrections, is not as extensive as that of a probationer." *Id.* at ¶ 29. As a result, the Court applied the constitutional law doctrine applicable to prisons, which permits random warrantless searches of inmate cells at any time. *See State v. Berard*, 154 Vt. 306, 576 A.2d 118 (1990).

Defendants' qualified immunity argument is both legally and factually inadequate. As to the law, Defendants have not cited any of the relevant federal or state cases, any Vermont statute, or even the condition of probation permitting the search of Byrne's home.[19] Turning to the facts, other than what was provided in the Complaint, the record is devoid of any information about the circumstances of the search, the reasons it took place, how it took place, the condition supporting the search, and the tailoring of that condition specifically to Byrne.[20] The deficiency in the record is understandable given the early state of this litigation, and underscores why qualified immunity questions are more often addressed at the summary judgment rather than the motion to dismiss stage.

On this record, however, I cannot recommend dismissal of the claims against Leggio and Nesbitt on qualified immunity grounds, and thus I recommend that the motion to dismiss the claims against Defendants Leggio and Nesbitt on these grounds be DENIED.

---

[19] Defendants' argument for dismissal consists of the claim that Leggio and Nesbitt were just following orders, and, thus, had to have been acting reasonably. Although Defendants cite no controlling precedent for their argument, the more fundamental problem with their contention is the fact that this assertion is not apparent from the face of the Complaint.

Defendants also argue that "[t]here is no evidence that either of the Defendants participated in the visit or alleged inspection with unlawful motive or intent." (Doc. 12 at 8-9.) Of course, this is true, given that, at this early stage in the litigation, no evidence has been submitted of anything. This is why resolution of qualified immunity issues is normally reserved for the summary judgment stage.

[20] In his response to the Motion to Dismiss, Byrne described the relevant conditions of his probation. By Byrne's description, the conditions provide that "upon request, and without delay, you must allow the probation officer to visit where you are staying; and . . . allow any law officer to inspect your residence to see if your [sic] actually there." (Doc. 17 at 7.) Again, even accepting this description as record evidence, there is absolutely no evidence as to the tailoring of these probation conditions to this particular probationer. Also, by this description, the probation conditions do not actually authorize a search; they allow for a "visit" and an "inspect[ion]" to determine whether the probationer is present at the residence, not the warrantless search that Byrne claims he was subjected to.

## VI. Failure to Allege Violations of Federal Rights

Next, Defendants argue that certain of the § 1983 claims against them should be dismissed for Byrne's failure to allege violations of cognizable federal rights.

### A. Eighth Amendment

The Eighth Amendment to the United States Constitution enjoins both the federal government and the states (by incorporation through the Fourteenth Amendment) from inflicting "cruel and unusual punishments." U.S. Const. amend. VIII. To prove that conduct rises to the level of cruel and unusual punishment, a plaintiff must satisfy both an objective and subjective standard. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). Under the objective test, a plaintiff must show that misconduct resulted "in unquestioned and serious deprivations of basic human needs," such as "the minimal civilized measure of life's necessities." *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). On the subjective side, a plaintiff must demonstrate that the defendants were "deliberately indifferent" to the objectively-serious risk to plaintiff's health or safety. *Jolly*, 76 F.3d at 480. This (seemingly-oxymoronic) "deliberate indifference" standard requires a plaintiff to show that defendants consciously knew of the risk and chose to disregard it. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, Byrne brings a range of Eighth Amendment claims against each Defendant.

As to his probation officers (Defendants Trudell and Goguen), as noted earlier, Byrne claims they ignored his accomplishments in making recommendations concerning his contact with his child, denied him contact with his girlfriend without just cause, sent

"defaming accusations" against him to employees at the prison facility housing him, were late for scheduled meetings, and made "threats" against him. (Doc. 4 at 6.) All of these alleged acts occurred while Byrne was under probation supervision.

To prevail, Byrne must satisfy the same objective and subjective prongs that generally apply to Eighth Amendment claims. *See Tsakonas v. Cicchi*, 308 F. App'x 628 (3d Cir. 2009) (applying same analysis to probationer's Eighth Amendment claim). The Supreme Court has recognized that, in assessing the objective seriousness of alleged Eighth Amendment violations, "discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted). In particular, probationary supervision, though perhaps subject to invasive conditions, is the price that criminal offenders pay for being allowed to end institutionalization; without a robust system of supervision, probationers would face extended incarceration. To rise to the level of an Eighth Amendment violation, conduct that does not purport to be punishment "must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

None of the allegations against Defendants Trudell and Goguen rise to the objectively-serious level necessary to constitute an Eighth Amendment violation. The alleged threats and slanderous comments against Byrne, without any accompanying physical harm, cannot form the basis of a § 1983 claim. *See generally Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) ("42 U.S.C. § 1983 is not designed to rectify

harassment or verbal abuse") (citing *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996)). Further, to the extent that Byrne's claims merely reflect his disagreement with his probation officers' management of his supervision—such as his claim that they ignored certain accomplishments, were late for meetings, or arbitrarily denied him contact with his girlfriend—such claims are not cognizable. Section 1983 (and, through it, the Eighth Amendment) is not a mechanism for courts to second-guess the work of probation officers; it is for rectification of objectively-serious constitutional violations. I "shun [Byrne's] invitation[] to micromanage the [probation] system." *Davidson v. Coughlin*, 968 F. Supp. 121, 128 (S.D.N.Y. 1997).[21]

All Eighth Amendment claims against Defendants Goguen and Trudell should therefore be DISMISSED.

As to Defendants Pereira and Dunn, Byrne's Eighth Amendment claims include allegations that they were involved in a meeting during which a number of individuals discussed cutting off Byrne's contact with his child. (Doc. 4 at 6.) At this meeting, despite never having met Byrne, Pereira made judgments about him "that were very far off." (*Id*.) In the same vein, Dunn, who had met Byrne in a "social setting" and thus had a "conflict of interest," "made defaming/slanderous and unprofessional assessments" of Byrne. (*Id*.) Byrne claims that Pereira also breached confidentiality, threatened the mother of his child to ensure he could not have contact with the child, and contributed to

---

[21] It bears mention that any "punishment" imposed upon Byrne, i.e., incarceration, was not imposed by Defendants Trudell and Goguen. *See Presley v. Morrison*, 950 F. Supp. 1298, 1301 (E.D. Pa. 1996) (rejecting § 1983 claim grounded in Eighth Amendment against probation officer because, insofar as incarceration could be viewed as the relevant punishment imposed, the probation officer could not be blamed for the incarceration because he had "no control" over either the revocation of probation or the sentence imposed upon revocation).

making his incarceration more difficult ever since Byrne told his probation officer to tell Pereira to "kiss his ass." (*Id*.)

Again, these allegations do not rise to the objectively-serious level necessary for a violation of the Eighth Amendment. Similar to the allegations against Defendants Trudell and Goguen, Byrne merely mounts a challenge against the conduct of his probation supervision. Although he raises a specific claim about the conduct of a meeting at which the participants discussed his relationship with his daughter, Byrne does not identify the decisional outcome of the meeting. Thus, he has not claimed to have suffered any harm—such as the cessation of contact with his child—as a result of Pereira and Dunn's alleged conduct at the meeting. Similarly, Byrne does not identify how Dunn's alleged conflict of interest manifested itself at the meeting, or how Pereira made his incarceration more difficult. In short, Byrne has not alleged how the conduct he attributes to Defendants Pereira and Dunn resulted in any harm cognizable under the Eighth Amendment. Accordingly, the claims against these Defendants should be DISMISSED.

As to Defendant Pallito, as discussed earlier, Byrne's Eighth Amendment claim hinges on his being the "man in charge" and having received a letter from Byrne detailing the abuse and upholding their conduct. If the conduct of Defendants Pereira and Dunn cannot form the basis of an Eighth Amendment claim, certain Defendant Pallito's mere role as a supervisor cannot either. Thus, Byrne's Eighth Amendment claim against Pallito should be DISMISSED.

Finally, as to Defendants Leggio and Nesbitt, Byrne has not raised any additional factual allegations beyond the warrantless search of his residence. This search, even if one were to assume it violates the Fourth Amendment, does not rise to the level of an Eighth Amendment violation. *See Jones v. Harris*, 665 F. Supp. 2d 384, 394-95 (S.D.N.Y. 2009) (prison cell search may only implicate Eighth Amendment if it "lacked any legitimate penological interest and was intended solely to harass"); *Colman v. Vasquez*, 142 F. Supp. 2d 226, 234 (D. Conn. 2001) (claim related to search will also "resonate under the Eighth Amendment" if "the searches are alleged to have caused extreme emotional distress"). Accordingly, this claim against Leggio and Nesbitt should be DISMISSED.

For the sake of comparison, examples of viable Eighth Amendment actions include: (1) claims concerning living conditions in prisons, *see, e.g.*, *Wilson v. Seiter*, 501 U.S. 294 (1991); (2) claims regarding inmate housing assignments, *see, e.g.*, *Jones v. Goord*, 190 F.R.D. 103 (S.D.N.Y. 1999); (3) claims relating to meals and food service, *see, e.g.*, *Robles v. Coughlin*, 725 F.2d 12 (2d Cir. 1983); (4) denial of exercise to an inmate, *see, e.g.*, *Davidson*, 968 F. Supp. at 128; and (5) inmate claims regarding medical care, *see Estelle v. Gamble*, 429 U.S. 97 (1976). The treatment alleged in the Complaint was in no way barbaric or inhumane. In fact, Byrne makes no allegation whatsoever that he suffered any sort of physical harm or assault. The Eighth Amendment violations alleged in Byrne's Complaint fall far short of meeting the objective standard of seriousness established in this line of cases. As Byrne's claim does not fit the paradigm

of viable Eighth Amendment claims, I recommend that each of these claims be DISMISSED.

## B.    Fourteenth Amendment

In his Complaint, Byrne alleges that Defendants violated his due process rights in various ways, including: (1) failing to follow procedures for transferring offenders to another probation officer's caseload; (2) imposing probation conditions unapproved by a court; (3) failing to follow established procedures for blocking telephone numbers at the correctional facility; (4) imposing special sex offender conditions without treatment team approval; (5) failing to give notice of probation conditions restricting contact with certain individuals; (6) "unlawfully" obtaining court documents; (7) giving false information to prison officials; (8) disclosing confidential information to third parties; and (9) failing to respond to Byrne's grievances.  (Doc. 4 at 7.)  Defendants maintain that none of this alleged misconduct deprived Byrne of a liberty interest cognizable under the due process clause.  (Doc. 12 at 11-12.)

The Fourteenth Amendment to the United States Constitution forbids state officials from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  To prevail on a Fourteenth Amendment due process claim, a plaintiff must prove that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted*); Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).  Defendants' Motion to Dismiss is directed at only the first prong of this test, asserting that Byrne was not deprived of any

cognizable liberty interest protected by the Fourteenth Amendment. According to

Defendants, "Plaintiff had no legitimate claim of entitlement to his supervision conditions

because the Commissioner of the Department has broad discretion in making decisions

with respect to determining an inmate's programming and classification, and an inmate

has no liberty interest in such a decision." (Doc. 12 at 12.)

"Liberty interests protected by the Fourteenth Amendment may arise from two

sources—the Due Process Clause itself and the law of the States." *Hewitt v. Helms*, 459

U.S. 460, 466 (1983) (citing *Meachum v. Fano*, 427 U.S. 215, 223-27 (1976)). The

Supreme Court has held that the Fourteenth Amendment itself does not create a liberty

interest in credit for good behavior, *see Wolff v. McDonnell*, 418 U.S. 539 (1974),

freedom from intrastate prison transfers, *Meachum*, 427 U.S. at 225, or release on parole,

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 (1979). A state statutory scheme,

however, may create a liberty interest where the Due Process Clause itself does not. "[A]

state creates a protected liberty interest by placing substantive limitations on official

discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). If the state decision-makers

are bound by particular objective criteria, the state may have created a constitutionally-

protected liberty interest. *See id*.; *see also Bd. of Regents of State Colleges v. Roth*, 408

U.S. 564, 577 (1972) (due process attaches when individual has "legitimate claim of

entitlement" to property interest at stake); *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)

(liberty interest "may arise from an expectation or interest created by state laws or

policies").

Vermont state law supplies such objective criteria for revocation of probation. Under the governing statutes, "[p]robation *shall not* be revoked unless the probationer violates a condition of his or her probation or is convicted of another crime." 28 V.S.A. § 303(a) (emphasis added). The statute further provides that

> [t]he court shall not revoke probation and order the confinement of the probationer unless the court finds on the basis of the original offense and the intervening conduct of the probationer that:
> (1) Confinement is necessary to protect the community from further criminal activity by the probationer; or
> (2) The probationer is in need of correctional treatment which can most effectively be provided if he or she is confined; or
> (3) It would unduly depreciate the seriousness of the violation if probation were not revoked.

28 V.S.A. § 303(b). While the court has discretion with respect to the ultimate sentence imposed, *see* 28 V.S.A. § 304(b), the underlying revocation itself cannot occur unless these objective criteria are met.

In such circumstances, where a parole or probation system is governed by objective criteria for revocation and incarceration, the statutory scheme gives rise to a liberty interest that "is valuable and must be seen as within the protection of the Fourteenth Amendment." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *see also Rheaume v. Pallito*, No. 5:11-cv-72, 2012 WL 6642706, at *4-7 (D. Vt. Nov. 15, 2012), adopted in full, 2012 WL 6642683 (D. Vt. Dec. 20, 2012). "[A] probationer, like a parolee, is entitled to a preliminary and a final revocation hearing" to protect this cognizable liberty interest. *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973). Of course, there is no inherent constitutional right to probation; but once a state grants a prisoner the conditional liberty dependent upon the observance of probation conditions, "due process

protections attach" to the decision to revoke probation.  *Vitek v. Jones*, 445 U.S. 480, 488

(1980).  Thus, various procedural protections apply to the decision to revoke probation.

*See Black v. Romano*, 471 U.S. 606, 611-12 (1985) (outlining probationer's rights during

revocation proceedings).  Specifically, "the probationer is entitled to an opportunity to

demonstrate that there was a justifiable excuse for any violation that occurred or that

societal interests, like community safety, do not require revocation."[22]  *United States v.*

*Brown*, 899 F.2d 189, 194 (2d Cir. 1990).  In seeming recognition of this liberty interest,

Defendants note that "Plaintiff will be given the opportunity to present arguments and

evidence on his own behalf prior to his probation being revoked."[23]  (Doc. 12 at 12.)

---

[22] There is also a substantive restriction on probation revocation.  In *Beardon v. Georgia*, 461 U.S. 660, 668-69 (1983), the Supreme Court held that where a fine or restitution is imposed as a condition of probation and the probationer, despite all reasonable efforts, cannot  meet the condition, it is fundamentally unfair for a court to revoke probation without considering whether adequate alternative methods of punishing the defendant are available.  Thus, where a violation is involuntary, as certain of Byrne's allegations would seem to suggest—such as his allegation that he did not have adequate notice of all of his probation conditions—a court must consider alternatives to revocation.

[23] Citing *Conway v. Cumming*, 161 Vt. 113, 116-17, 636 A.2d 735, 736 (1993), Defendants argue that "an inmate does not have a liberty interest in participating in rehabilitative programs for purposes of earning good time credits."  This is correct, but irrelevant.  *Conway* stands for the proposition that a Vermont inmate does not have a liberty interest in release on furlough because an individual's "status under furlough more closely resembles that of an inmate seeking a particular right or status within an institution, rather than that of a parolee."  *Id*. at 116, 636 A.2d at 736; *see also Conway v. Gorczyk*, 171 Vt. 374, 765 A.2d 463 (2000).  But *Conway* also recognized that parolees have a protected liberty interest in their release on parole, citing *Morrissey*, 408 U.S. at 482, which has been subsequently extended to release on probation, *see Gagnon*, 411 U.S. at 782.  In other words, the case law specifically differentiates between probation and parole on the one hand, and furlough and imprisonment on the other.  As the Vermont Supreme Court put it, the reach of due process protection "has generally stopped at the prison walls."  *Conway*, 161 Vt. at 116, 636 A.2d at 736.

Although Defendants repeatedly refer to Byrne as an "inmate," at all relevant times described in his Complaint he was on probation.  Despite his current incarceration, he must be treated as a probationer for purposes of assessing the liberty interests at stake in this litigation.

Byrne does not specifically allege that his probation was revoked in an arbitrary manner, thereby triggering the protections of the Fourteenth Amendment.[24]  He instead argues that certain of his probation conditions were unlawfully or arbitrarily imposed.  He fails, however, to link up these allegedly unlawful conditions to the decision to revoke his probation.  Byrne does not necessarily have a liberty interest in the conduct of his probation to the extent that it does not result in imprisonment.  *See Parsons v. Pond*, 126 F. Supp. 2d 205, 218 (D. Conn. 2000) ("[probationer] has no cognizable property or liberty interest in having the defendants follow the procedures established by [probation] rules and regulations, unless the defendants otherwise deprived him of a property or liberty interest in the absence of those procedures").

But he today stands incarcerated at a Vermont prison facility.  It may thus be presumed that Byrne now complains about the conduct of his probation supervision because, in his view, that conduct caused his present incarceration and pending revocation.  Despite Byrne's failure to tie his allegedly deficient supervision specifically to his current incarceration, in light of his status as a *pro se* litigant I conclude that this failure is not fatal to his claim.  It would require a degree of incongruence to conclude that Byrne is complaining solely about his probation supervision in the abstract, unrelated to his incarceration.

While Byrne certainly does not have a liberty interest in the precise conduct of his probation—such things as the transfer of his supervision to a different officer or failing to

---

[24]  Byrne's argument that he should have received a revocation hearing before being taken into custody has been rejected by the Supreme Court.  *See Moody v. Daggett*, 429 U.S. 78, 86 (1976) ("there is no requirement for an immediate hearing"); *Morrissey*, 408 U.S. at 488 ("[t]he revocation hearing must be tendered within a reasonable time after the parolee is taken into custody").

block telephone numbers properly—he *does* have a liberty interest in his release status. Defendants' sole argument for dismissal is that no liberty interest at all is at stake, and thus no due process violation could have taken place. Given Defendants' misplaced reliance upon this argument, the current record is lacking any information about the process Byrne was afforded before his current incarceration. Because Byrne has a protected liberty interest in his probation release status, to the extent that his Fourteenth Amendment claim argues that he has been incarcerated arbitrarily in violation of established probation procedures and due process, the Motion to Dismiss should be DENIED.

Again, however, none of the conduct alleged in any way relates to Defendants Leggio and Nesbitt, who merely conducted the search of his home. Thus, the Fourteenth Amendment due process claims against these Defendants should be DISMISSED.

## VII.  Application of *Heck v. Humphrey*

Next, Defendants argue that the § 1983 claims should be dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).

There, the Supreme Court held that a plaintiff cannot use a § 1983 action to challenge the validity of a conviction or sentence unless that conviction or sentence had already been reversed, called into doubt by the issuance of a habeas corpus petition, or otherwise invalidated. *Id*. at 486-87. "[T]he district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the [§ 1983] complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id*. at 487.

The Second Circuit has noted that *Heck* "does not bar a § 1983 action that, at most, increases the likelihood that a plaintiff will eventually be able to overturn a still-outstanding conviction, but which does not go so far as to necessarily demonstrate the conviction's invalidity." *McKithen v. Brown*, 481 F.3d 89, 102 (2d Cir. 2007). Accordingly, "the proper inquiry is whether 'victory for the prisoners [would] necessarily [mean] immediate release or a shorter period of incarceration.'" *Id*. (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 80 (2005)).

This rule would seemingly apply to § 1983 claims challenging the validity of probation revocations. District courts within the Second Circuit have repeatedly applied these principles in the context of parole revocations. *See, e.g.*, *Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 200-01 (S.D.N.Y. 2004) (dismissing § 1983 claim challenging parole revocation decision); *Sumter v. Marion*, No. 98 CIV. 2744, 1999 WL 767426, at *5 (S.D.N.Y. Sept. 28, 1999) (dismissing § 1983 claim because to find in plaintiff's favor would require finding that defendants falsified evidence at the revocation hearing, thus invalidating the result); *Sealey v. Fishkin*, No. 96 CV 6303, 1998 WL 1021470, at *5 (E.D.N.Y. Dec. 2, 1998) (dismissing § 1983 claim alleging police officer made false statements to parole officials, ultimately leading to parole revocation); *see also Davis v. Cotov*, 214 F. Supp. 2d 310, 316 (E.D.N.Y. 2002) (collecting cases). The rationale for application of *Heck* to parole revocation applies with no less force to probation revocations, and there is substantial support for a corresponding extension of the doctrine. *See Cobb v. Florida*, 293 F. App'x 708 (11th Cir. 2008); *Baskett v. Papini*, 245 F. App'x 677 (9th Cir. 2007); *Eaton v. McGee*, 113 F. App'x 9 (5th Cir. 2004); *Crow v. Penry*, 102

F.3d 1086, 1087 (10th Cir. 1996); *see also Dass v. Winkler*, 62 F. App'x 408 (2d Cir. 2003) (applying *Heck* doctrine to probation revocation in summary order); *Rheaume v. Hofmann*, No. 1:08-CV-4, 2008 WL 2705068, at *3 (D. Vt. July 9, 2008). Having found no contrary authority, I apply the *Heck* rule to this claim.

Much of Defendants' argument for dismissal hinges on the application of the Supreme Court's decision in *Edwards v. Balisok*, 520 U.S. 641 (1997). In that case, the Court addressed the applicability of the *Heck* rule to intra-prison sanctions. An inmate, who had been found guilty of prison rule infractions and sentenced to the loss of 30 days' good-time credit that he had previously earned toward his release, brought a § 1983 suit alleging that the procedures used in the disciplinary hearing violated his Fourteenth Amendment due process rights. *Id*. at 643. He claimed that the hearing officer was deceitful and biased at the disciplinary proceeding by concealing exculpatory witness statements, refusing to ask specified questions of requested witnesses, and intentionally denying him the right to present evidence in his defense. *Id*. at 644. For relief, the inmate sought only damages rather than reinstatement of the good-time credits. "That is to say, his claim posited that the procedures were wrong, but not necessarily that the result was." *Id*. at 645.

The Supreme Court found this distinction immaterial. "[T]he nature of the challenge to the procedures could be such as necessarily to imply the invalidity of the judgment." *Id*. That was true in *Edwards*, because, if the claimed procedural defects were established, the good-time credits would be reinstated. *Id*. at 646-47. "The due process requirements for a prison disciplinary hearing are in many respects less

demanding than those for criminal prosecution, but they are not so lax as to let stand the decision of a biased hearing officer who dishonestly suppresses evidence of innocence." *Id*. at 647. In summary: "a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 81-82.

Applied here, the question is: would Byrne's success in this § 1983 action necessarily demonstrate the invalidity of his continued confinement?

To the extent Byrne seeks injunctive relief, the answer to this question is obviously "yes" and his claim is barred by this doctrine. Even before *Heck*, it was clear that a state prisoner seeking injunctive relief in the form of immediate release must proceed in habeas corpus, and not under § 1983. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ("when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus"). Byrnes injunctive claim for immediate release should be DENIED.

But Byrne also seeks damages. Defendants argue that this portion of Byrne's suit would still necessarily invalidate his confinement, tautologically contending that Byrne's "demand for relief challenges the validity of his confinement because his claim necessarily requires consideration of whether the decision to re-incarcerate him was valid." (Doc. 12 at 14.) But, at this point, it is unclear from the record whether Byrne's

alleged constitutional violations, if established, would invalidate his incarceration.  For example, he has not alleged that the warrantless search by Defendants Leggio and Nesbitt led to his incarceration,[25] nor that the mishandling of his supervision by Defendants Goguen and Trudell directly caused any revocation.[26]  The inquiry as to whether a recovery on these claims would necessarily invalidate Byrne's incarceration is "inherently a factual one," and at this point I "have no information . . . as to the nature of the evidence which might have been available against him in" any revocation proceeding. *Covington v. City of New York*, 171 F.3d 117, 122-23 (2d Cir. 1999).  Byrne's success may increase the likelihood that he would be freed, but, on this record, I cannot conclude that this is "necessarily" the case.  "[T]hat a prisoner's success might be merely helpful or *potentially* demonstrative of illegal confinement is, under this standard, irrelevant." *McKithen*, 481 F.3d at 102.

Accordingly, Defendants' Motion to Dismiss on *Heck* grounds should be GRANTED as to Byrne's claim for injunctive relief for immediate release and should be DENIED as to Byrne's claim for damages.

---

[25]  Indeed, in *Heck* the Supreme Court specifically discussed the applicability of this doctrine to a § 1983 claim challenging the constitutionality of a search.  "[A] suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction.  Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful." *Heck*, 512 U.S. at 487 n.7 (internal citations omitted).  Thus, even if fruit of the allegedly-unlawful search were necessary for Byrne's current incarceration, Defendants would also have to show that the information obtained by the search would not have been admissible on some other basis.  Defendants have made no such argument.

[26]  As previously stated, this would certainly be a fair reading of the Complaint, but, at this point, it is not the only reading, and thus a decision in Byrne's favor would not "necessarily invalidate" his incarceration.

## VIII.  Available Remedies

Defendants argue that compensatory and punitive damages are unavailable for Byrne's claims.

### A.    Compensatory Damages

Defendants first maintain that Byrne's § 1983 claim for compensatory damages should be dismissed because he has failed to allege that he suffered any physical injury.

This argument relies upon § 1997e(e) of the Prison Litigation Reform Act ("PLRA"), which provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).[27]  Because the statutory phrase "Federal civil action" is unqualified, the statute "applies to all federal civil actions including claims alleging constitutional violations." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002); *see also Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998).  This section is not a bar to suit, but instead operates only as "a limitation on recovery of damages for mental and emotional injury in the absence of a showing of physical injury."  *Thompson*, 284 F.3d at 416.  In

_____

[27] The overall purpose of the PLRA was to "curb the filing of frivolous lawsuits by prisoners." *Cox v. Malone*, 199 F. Supp. 2d 135, 139 (S.D.N.Y. 2002), *aff'd*, 56 F. App'x 43 (2d Cir. 2003).  To that end, § 1997e(e)'s physical injury requirement was meant "to tie recovery for emotional injury to the existence of a corresponding physical injury.  It seems that Congress concluded that the existence of a physical injury would distinguish meritorious prisoner claims of emotional injury from frivolous ones; the physical injury would, in essence, vouch for the asserted emotional injury.  Congress recognized that, unlike physical injuries, emotional injuries are inherently difficult to verify and therefore tend to be concocted for frivolous suits."  *Espinal v. Goord*, No. 00 Civ. 2242, 2001 WL 476070, at *12 (S.D.N.Y. May 7, 2001); *but see Dawes v. Walker*, 239 F.3d 489, 494-97 (2d Cir. 2001) (Walker, C.J., writing separately) ("highlight[ing] a deficiency" in § 1997e(e) by arguing that the statute may not adequately disincentivize frivolous prisoner suits because the statute bars only compensatory damages but continues to permit the "windfall" of punitive damages, and calling for Congress to consider amending the statute "to require actual damages as a component of prisoners' § 1983 prima facie case").

*Thompson*, the Second Circuit made clear that § 1997e(e) "does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Id*. As to the extent of physical injury required for recovery of compensatory damages, the statute provides little guidance, given the absence of a definition for the phrase "physical injury"; the Second Circuit, however, has held that the statute refers to physical injuries that are "more than *de minimis*." *See Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999); *see also Warren v. Westchester Cnty. Jail*, 106 F. Supp. 2d 559, 570 (S.D.N.Y. 2000). In sum, an inmate cannot sue for damages for mental anguish or emotional distress alone without evidence of a physical injury, though other remedies may remain available.

According to his Complaint, Byrne has suffered "injury to feelings and reputation," "loss of business relationships," and "injury to . . . mental health." (Doc. 4 at 8.) Given his failure to allege any physical injuries, Defendants argue that all of Byrne's claims for compensatory damages are barred. (Doc. 12 at 17.)

Tracking the language of § 1997e(e), the limitation on recovery applies only to lawsuits involving (1) federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody. *See* 42 U.S.C. § 1997e(e). While this is undoubtedly a federal civil action brought to recover for mental or emotional injury, the two remaining conditions—whether the suit was brought "by a prisoner" for injuries suffered "while in custody"—merit closer scrutiny.

As used in the PLRA, the term "prisoner" is defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated

delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). In determining whether a plaintiff is a "prisoner confined in jail," the Court must look to the status of the plaintiff *at the time he brings his suit*, rather than at the time of the alleged constitutional violations. *See Perez. v. Westchester Cnty. Dept. of Corrections*, 587 F.3d 143 (2d Cir. 2009); *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999); *In re Nassau Cnty. Strip Search Cases*, No. 99-CV-2844, 2010 WL 3781563, at *4-5 (E.D.N.Y. Sept. 22, 2010); *see also Ahmed v. Dragovich*, 297 F.3d 201, 210 n.10 (3d Cir. 2002); *Harris v. Garner*, 216 F.3d 970, 979-80 (11th Cir. 2000) (en banc); *Page v. Torrey*, 201 F.3d 1136 (9th Cir. 2000); *Doe v. Washington Cnty.*, 150 F.3d 920 (8th Cir. 1998); *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998). Because Byrne was incarcerated in a state correctional facility at the time he filed the instant suit, he qualifies as a prisoner under the terms of the PLRA.

The closer question is whether Byrne suffered his injuries "while in custody," as required for the bar on damages to apply. The common usage of "custody," in the *Miranda* context in which the question most often arises, reflects not just imprisonment, but also any situation in which a reasonable person would feel a restraint on his movement such that he would not feel "free to leave." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). Formal arrest is the prototypical situation resulting in an individual being "in custody" for *Miranda* purposes. *See id.* Using this definition, the PLRA's limitation on the recovery of compensatory damages applies to harms that arise while a plaintiff is outside the prison walls, so long as the person is "in custody" (i.e., not free to

leave) at the time the harm is inflicted.  *See Napier v. Preslicka*, 314 F.3d 528, 532-33 (11th Cir. 2002).

Here, it is unclear precisely when the alleged mental and emotional harms occurred.  If they took place at the moment of the alleged constitutional deprivations—while Byrne was free on probation and not under arrest or otherwise "in custody"—they appear to fall outside of the PLRA's bar on recovery.  If, on the other hand, the latent harms ripened only after Byrne was placed in custody, the PLRA would not permit compensatory damages.  Given this ambiguity, as well as the deference due the Complaint and the latitude afforded Byrne as a *pro se* litigant, I cannot conclude that the PLRA bars recovery at this stage.[28]

Because Defendants have not shown that Byrne's alleged injuries occurred while he was in custody, I recommend that this portion of Defendants' Motion to Dismiss be DENIED.

---

[28] Further, Byrne's remaining claims under the Fourth and Fourteenth Amendments (unlike a claim under the Eighth Amendment, for example), do not neatly fit the physical injury requirement, as physical injury does not usually accompany these claims.  The absence of physical injury is a crude mechanism to discern frivolousness in the context of a claim that would not normally be expected to cause physical injury.  *See Lipton v. County of Orange, N.Y.*, 315 F. Supp. 2d 434, 457-58 (S.D.N.Y. 2004) (recognizing that the bar on compensatory damages does not apply to claims arising under the First Amendment, and collecting cases to that effect); *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998) ("The deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred.  Therefore, § 1997e(e) does not apply to First Amendment Claims regardless of the form of relief sought."); *but see Al-Amin v. Smith*, 637 F.3d 1192, 1197 (11th Cir. 2011) ("The PLRA's preclusive effect thus applied equally to all constitutional claims, as the Court did not distinguish between constitutional claims frequently accompanied by physical injury (e.g., Eighth Amendment violations) and those rarely accompanied by physical injury (e.g., First Amendment violations).").

### B.     Punitive Damages

Defendants next seek to dismiss Byrne's claim for punitive damages, arguing that Byrne has not satisfied the state-of-mind standard necessary for such damages.

Punitive damages may be awarded under § 1983 only when "'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Disorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  Stated differently, "[t]o be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'"  *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538 (1999)); *see Colon v. City of New York*, Nos. 09 CV 0008, 09 CV 0009, 2012 WL 691544, at *15-17 (E.D.N.Y. Feb. 9, 2012), adopted in full, 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012) (discussing punitive damages standard and the amount of damages awarded in past § 1983 cases).  Given the inherently subjective nature of discerning an individual's motives or intent, and consistent with the Federal Rules of Civil Procedure, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Still, allegations of malice may not be stated as mere legal conclusions.  *See Iqbal*, 556 U.S. at 687 (general "short and plain statement of the claim" mandate in Rule 8(a) should control allegations of malice).

Byrne is seeking punitive damages from all Defendants, in varying amounts: $2,000 each from Defendants Leggio and Nesbitt; $3,000 each from Defendants Pallito,

Pereira, and Dunn; and $10,000 each from Defendants Trudell and Goguen. (Doc. 4 at 8-9.)

The allegations contained in the Complaint do not support a punitive damages award against Defendants Leggio, Nesbitt, Pallito, Pereira, or Dunn. Byrne does not allege that Defendants Leggio or Nesbitt conducted the search of his home with malicious intent. The claims against Defendants Pallito, Pereira, and Dunn do not allege any evil motive or intent behind their conduct, but rather, allege that these Defendants were careless in failing to properly supervise their subordinates, Defendants Trudell and Goguen.

These two Defendants, however, could be viewed as having acted with "evil motives" based upon the allegations in the Complaint. Specifically, Byrne alleges that these Defendants told lies, issued threats, and violated rules and procedures governing probation in an effort to make Byrne's probation (as well as his subsequent incarceration) as onerous as possible. Thus, Byrne has sufficiently alleged the malicious intent necessary for the punitive damages claims against these Defendants to remain in the case.

> [P]roof of the defendants' intent is not readily available to an inmate when filing his complaint. Since his allegations would be arguably sufficient to survive a motion to dismiss, the Court should not dismiss them at this early stage in the case. Once [the inmate] has had an opportunity to develop his claims more fully, the defendants may again move for summary judgment on these claims if appropriate.

*Martin v. Gold*, No. 1:05-CV-28, 2005 WL 1862116, at *10 (D. Vt. Aug. 4, 2005).

Accordingly, I recommend that Defendants' Motion to Dismiss be DENIED insofar as it seeks dismissal of the punitive damages claims against Defendants Trudell

and Goguen in their individual capacities.  I further recommend that the punitive damages claims against Defendants Leggio, Nesbitt, Pallito, Pereira, and Dunn be DISMISSED.

## IX.     Vermont State Law Tort Claims

In addition to the various § 1983 claims, Byrne has brought state law tort claims sounding in negligence and defamation against Defendants Goguen, Trudell, Pereira, Dunn, and Pallito.  (Doc. 4 at 8.)  Defendants argue that these claims should be dismissed by application of the Vermont Tort Claims Act ("VTCA"), 12 V.S.A. §§ 5601-5606.

As previously stated, suits against a state are barred unless the state waives sovereign immunity and consents to suit.  *See Williams v. State*, 156 Vt. 42, 55, 589 A.2d 848 (1990).  The VTCA constitutes a limited waiver of Vermont's sovereign immunity. The central provision of the statute provides that, with limited exceptions, "[t]he state of Vermont shall be liable for injury to persons or property or loss of life caused by the negligent or wrongful act or omission of an employee of the state while acting within the scope of employment."  12 V.S.A. § 5601(a).  Under the "discretionary function" exception, however, the State's waiver of sovereign immunity does not apply to acts or omissions of state employees that are "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused."  12 V.S.A. § 5601(e)(1).

The VTCA not only waives Vermont's sovereign immunity, but it also limits the potential tort immunity of state officials.  Pursuant to 12 V.S.A. § 5602, "[w]hen the act or omission of an employee of the state acting within the scope of employment is believed to have caused damage to property, injury to persons, or death, the *exclusive*

right of action shall lie against the state of Vermont; and no such action may be maintained against the employee or the estate of the employee." The statute also explicitly provides that it "does not apply to gross negligence or willful misconduct." 12 V.S.A. § 5602(b). Thus, unless a state official acts with gross negligence or intent, he cannot be sued for conduct occurring within the scope of his employment; a case may only lie against the State of Vermont and not against the official himself. The VTCA also provides for a certain level of indemnification of state officials by the state. 12 V.S.A. § 5606.[29]

As discussed in the previous section, the Complaint does not allege gross negligence or willful misconduct by Defendants Pallito, Pereira, or Dunn. Rather, the claims against these Defendants primarily hinge upon their negligent supervision of their subordinates. Pursuant to the VTCA, all claims against these Defendants should have been brought directly against the State. *See* 12 V.S.A. § 5602(a).

As also discussed above, the alleged conduct of Defendants Trudell and Goguen could be viewed as willful or grossly negligent. Accepting the allegations in Byrne's Complaint, these Defendants made numerous slanderous comments and threats against Byrne. Byrne's Complaint clearly contemplates that these Defendants took part in this conduct intentionally, hoping to make Byrne's term of probation more difficult. *See Estate of Rodriguez v. Simon*, No. 1:06-CV-125, 2007 WL 2154238, at 6 (D. Vt. Mar. 30,

---

[29] Defendants also make a passing reference to the fact that the VTCA vests "exclusive jurisdiction" in "[t]he superior courts of the state," 12 V.S.A. § 5601(a), suggesting dismissal on this basis may be appropriate. (Doc. 12 at 16-17.) Defendants also properly recognize, however, that "[b]ecause negligence is a state law claim, this Court may, in its discretion, exercise supplemental jurisdiction." (Doc. 12 at 17.) In any event, because Plaintiff's other claims do not lie against the State pursuant to the waiver of sovereign immunity set forth in the VTCA, the jurisdictional bar does not even apply here.

2007), adopted in full, 2007 WL 2107542 (D. Vt. July 19, 2007) (declining to dismiss state tort claims against state officials based upon allegations of gross negligence). Of course, no factual findings have been made as to these allegations, but at this early stage of the litigation Byrne's Complaint must be accepted as true. As such, tort claims against these Defendants in their individual capacities are not barred by the Vermont Tort Claims Act. *See* 12 V.S.A. § 5602(b).

Accordingly, I recommend that the tort claims against Defendants Pallito, Pereira, and Dunn be DISMISSED, but the tort claims against Defendants Trudell and Goguen remain.[30]

## Conclusion

For the foregoing reasons, I recommend that Defendants' Motion to Dismiss (Doc. 12) be GRANTED in part and DENIED in part.

Specifically, I recommend as follows:

Pursuant to the doctrine of sovereign immunity, to the extent Byrne brings his § 1983 claims against Defendants Pallito and Pereira for money damages in their official capacities, those claims should be DISMISSED.

Due to their lack of personal involvement, the Fourteenth Amendment claims against Defendants Pereira and Dunn, as well as the Eighth and Fourteenth Amendment claims against Defendants Leggio and Nesbitt, should be DISMISSED.

---

[30] Defendants also argue that the state tort claims should be dismissed because, if the court dismisses all underlying federal claims, exercise of jurisdiction over the state claims will be improper. (Doc. 12 at 17.) Because I have not accepted Defendants' arguments with respect to dismissal of the federal claims, dismissal of the state claims on this basis is inappropriate.

All Eighth Amendment claims should be DISMISSED for failure to allege violation of a federal right.

The Fourteenth Amendment claims against Defendants Leggio and Nesbitt should be DISMISSED for failure to allege violation of a federal right.

Pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), to the extent Byrne seeks immediate release from incarceration, this request for relief should be DISMISSED.

All claims for punitive damages claims against Defendants Leggio, Nesbitt, Pallito, Pereira, and Dunn should be DISMISSED.

Pursuant to the Vermont Tort Claims Act, all state tort claims against Defendants Pallito, Pereira, and Dunn should be DISMISSED.

All remaining bases on which Defendants move to dismiss Byrne's claims should be DENIED.

Finally, I recommend that Byrne's "Motion to Strike Pursuant to Rule 12(f)(2)" (Doc. 17) be DENIED.

Dated at Burlington, in the District of Vermont, this 18th day of March, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).